**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

JEANETTE WILLIAMS,

                Debtor-Appellant,

                - against -

MICHAEL J. MACCO,

                Trustee-Appellee.

-------------------------------------------------------------X

CV-04-5133 (ERK)

**MEMORANDUM & ORDER**

KORMAN, C.J.:

This matter arises out of a bankruptcy proceeding before Judge Milton. Ms. Jeanette Williams ("Debtor-Appellant") appeals a decision and order of September 30, 2004, dismissing her Chapter 13 plan, which had been confirmed in March, 2004, but denying her request to disgorge commissions from the standing trustee assigned to her case, Michael J. Macco ("Trustee-Appellee"). A brief summary of the facts is as follows: Debtor-Appellant filed for Chapter 13 bankruptcy in July, 2003. In December, 2003, Judge Milton approved the pre-confirmation sale of Debtor-Appellant's real property at her request, the proceeds of which were then disbursed to creditors by the Trustee-Appellee, who retained a commission of $24,924.48. In March, 2004, on the day of the confirmation hearing, Debtor-Appellant attempted to dismiss her case, but Judge Milton, who was concerned with Debtor-Appellants's motives, confirmed her Chapter 13 plan anyway. Debtor-Appellant then filed a motion of reconsideration, requesting a stay to prohibit the Trustee-Appellee from making any further disbursements pending the outcome of the motion. After the Bankruptcy Court refused to issue the stay, Debtor-Appellant appealed, requesting a preliminary injunction, (In re Jeanette

_Williams_, 04-CV-1621 (ERK)), which I dismissed without prejudice on April 22, 2004 because of the pendency of the motion for reconsideration. The Trustee-Appellee then disbursed additional funds, retaining a commission of $10,795.08. As noted above, in September, 2004, Judge Milton then granted Debtor-Appellant's motion to dismiss, but refused to disgorge the Trustee-Appellee's commissions.

Debtor-Appellant now appeals Judge Milton's decision in part, arguing that Judge Milton should have disgorged commissions on both pre and post-confirmation disbursements.

## BACKGROUND

Ms. Jeanette Williams, (Debtor-Appellant), owned, but was unable to meet her financial obligations regarding, two adjacent parcels of real property, located at 264 and 266 St. James Place in Brooklyn, New York. In December 2000, after falling behind on her mortgage for the 264 St. James Place property, Debtor-Appellant decided to sell it and use the proceeds to pay off her remaining debt. To that end, she entered into a contract of sale with Marie Ange Valerus ("Valerus") for $320,000 ("Valerus Contract"). However, as a result of what Debtor-Appellant's counsel describes as "a variety of facts," closing did not occur as planned. And, after a delay of more than a year, the contract price was no longer sufficient to allow Debtor-Appellant to pay off her mounting debt, so she refused to close title on the property. Valerus then sued Debtor-Appellant in Kings County Supreme Court for specific performance, and filed a notice of pendency which disabled Debtor-Appellant from selling the property.

On July 14, 2003, Debtor-Appellant filed a chapter 13 petition, the third chapter 13 petition by Debtor-Appellant over the prior two-years. Debtor-Appellant's goal in filing was "to obtain the

2

rejection of the pre-petition executory contract with . . . . Valerus, and, if successful, to sell the property to a new buyer at a higher price." Decision at 3. On August 5, 2003, Judge Milton issued an order extending Debtor-Appellant's time to file schedules and a plan until August 15, 2003, a deadline which Debtor-Appellant missed.

On August 28, Chase Manhattan Bank ("Chase"), the mortgagee of 264 St. James Place, filed an application for an order granting relief from the automatic stay with prejudice, due to the "debtor's history of allegedly abusive filings." Apparently, each of Debtor-Appellant's chapter 13 filings had disabled Chase from foreclosing on the property. Id. at 3. On September 15, 2003, the Trustee-Appellee filed a motion to dismiss, noting Debtor-Appellant's failure to file a plan and schedules, as well as her failure to provide any post-petition payments to the Trustee-Appellee. Debtor-Appellant did not oppose this motion. Id.

On October 5, 2003, after retaining new counsel, Debtor-Appellant filed her Chapter 13 plan and the required schedules, along with a motion seeking a nunc pro tunc extension, which was granted. See D. 18 ("Notice of Motion for Nunc Pro Tunc Extension of Time"). Debtor-Appellant's plan provided that she would pay the Trustee-Appellee "$200 monthly for 60 months, plus all net proceeds from the sale of 264 St. James Place . . . after payments of liens and costs of sale." Decision at 3. The Trustee-Appellee would then disburse funds to the remaining secured creditors, as well as unsecured creditors according to properly filed proofs of claim. Finally, the Valerus contract would be rejected. See D. 18.

At the same time, Debtor-Appellant filed a motion to sell the 264 St. James property free and clear of liens and encumbrances, asking the court to authorize the sale of the property to a third party for $500,000. See D. 15. ("Application for Order Permitting Sale of Real Property Free and Clear

of Liens and Encumbrances" hereinafter "Motion to Sell"). Complicating the sale was the Valerus Contract. Debtor-Appellant argued that the Bankruptcy Court could reject the Valerus Contract, noting that under 11 U.S.C. § 1303, Debtor-Appellant possessed "exclusive of the trustee, the rights and powers of a trustee under sections 363(b), 363(d), 363(f), and 363(1)." Section 363 (b) in turn, provided that "the trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate," while 363(f) provided that: "[t]he trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if . . . such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property." See id. at ¶¶ 11-13. Because the value of the new sales price exceeded the lien value on the property, Debtor-Appellant argued concluded that the Bankruptcy Court had the right to permit the sale. Id. at ¶ 14.

In the Motion to Sell, Debtor-Appellant set out her proposal to "directly first pay" the secured liens on the 264 St. James property, including the balance on the Chase mortgage, several tax liens, outstanding water and sewer charges, real estate taxes, a lien in favor of the New York City Environmental Control Board, and costs associated with the sale of the property. Debtor-Appellant then proposed to pay "the balance of the proceeds of the sale directly to the Chapter 13 trustee from which he [could] pay the balance of debtor's chapter 13 plan, a ten (10%) percent commission on the balance of the debts paid, and refund the balance to the debtor." D. 15 at ¶¶ 15,16. Debtor-Appellant thus proposed to pay $320,691 directly at closing, representing both the arrears and the balance of the Chase mortgage, as well as the several liens and the closing costs, leaving the Trustee-Appellee $179,309 to cover the remaining claims, as well as commissions.

The Trustee-Appellee opposed direct payments, requesting that any order authorizing the sale

4

require that "all secured creditors be paid and that any mortgage arrears and other secured claims filed on the property be paid through the Trustee's office and the balance of proceeds be turned over to the trustee." D. 20 ("Affidavit in Partial Opposition"). As characterized by the Debtor-Appellant, the Trustee-Appellee's position was that "all funds be paid to the trustee, and that the trustee remit said funds, keeping commissions on said funds, before paying off the balance of all plan creditors." D. 25 ("Affirmation in Further Support of [Motion to Sell]") at ¶ 22.

Debtor-Appellant responded that because she owned two properties, and because a major portion of her debt, including the mortgage arrears on 266 St. James Place, would be paid through the "ordinary and usual chapter 13 process," she "should be allowed to confirm a plan whereby the liens on [264 St. James Place] will be paid directly, at closing." Id. at ¶ 32. Debtor-Appellant also argued that charging commissions on the entire amount of arrears properties was not feasible, because she needed an additional $24,500 at closing to pay for post-petition mortgage payments ($11,000), and for a new water main and new boiler ($13,500) to "bring her residence [at 266 St. James Place] . . . into proper working order so that it [would] again function as a rent producing property." Id. at ¶ 41. Subtracting $24,500 from the $179,309, left the Trustee-Appellee with $154,809, which, according to Debtor-Appellant, was just enough to pay the $154,780 in remaining secured and unsecured claims filed, as well as a commission of ten percent. See id. Debtor-Appellant argued that were the Trustee-Appellee to disburse the $159,898 in mortgage arrears and other secured obligations, taking an additional $17,598 in commissions, there would be insufficient funds to cover the additional $24,500 necessary for boiler and water main repairs. Id. at ¶¶ 33-43. Notably, in the calculations provided to support Debtor-Appellant's claim that commissions were unfeasible, she included the sum of $35,000 for "Reserve for ECB Liens of record" under the category of liens to be paid by the Trustee-Appellee,

5

even though in both her plan and her initial Motion to Sell, Debtor-Appellant had previously proposed to pay the NYC Environmental Control Board lien, then estimated at $30,000, directly.

On November 19, 2003, Judge Milton held a hearing ("Sale Hearing") to address Debtor-Appellant's motion as well as the question of whether Debtor-Appellant could reject the Valerus contract. During the hearing, Debtor-Appellant requested that Judge Milton allow the sale of 264 St. James Place to take place immediately, prior to confirmation, even though, according to the Trustee-Appellee, the usual procedure in the Eastern District was that the sale of estate property in a Chapter 13 proceedings was permitted only after confirmation of the bankruptcy plan. See Brief of Appellee at 7. In support of her request, Debtor-Appellant claimed that 266 St. James Place was in jeopardy because winter was approaching and the boiler did not work, and thus she needed the immediate approval of the contract of sale so that she could use the proceeds to purchase a new boiler and a new water main. Decision at 4.

The issue of commissions was raised several times during the hearing. At the onset, Judge Milton stated that the issue of commissions would be addressed if he granted the application. See D. 66 ("Transcript of Nov. 19 Hearing") at 2. The Trustee-Appellee's position was that he was entitled to commissions on the entire amount of the mortgage; that he had offered to take commissions on the arrearage only as a compromise; and, that he was not permitted to offer a lower percentage "than [is offered to] every other Chapter 13 debtor." Id. Debtor-Appellant, who noted initially that she felt the issue was a "confirmation issue," id. at 4, acknowledged that the Trustee-Appellee would be paid commissions, but disputed the "method and manner" of commissions, noting that the sums necessary for repairs and post-petition mortgage payments (now estimated at $25,000) left insufficient funds for commissions on the entire amount of secured claims. Id. at 6-7.

6

At the end of the hearing, the court held that the Valerus contract was executory and could be rejected. Id. at 9. The court also granted Debtor-Appellant's application to sell free and clear of liens, and directed Debtor-Appellant's counsel to settle an order of sale for the court's signature on November 21, 2004. Id. at 10. Debtor-Appellant's counsel then addressed the issue of the $25,000, at which point Judge Milton interrupted and asked why the $25,000 "needed to go through the Debtor at all?" Debtor-Appellant replied that it did not need to, and that she was happy to propose and authorize by order that the funds be paid directly to the Trustee-Appellee. Id. Neither the court nor the parties raised the issue of commissions.

On December 12, 2003, Judge Milton signed the order of sale ("Order of Sale") prepared by Debtor-Appellant's counsel authorizing the immediate sale of 264 St. James Place for $500,000 to a third-party purchaser. Consistent with Debtor-Appellant's representations and the Judge Milton's request during the Sale Hearing, the Order of Sale provided that all proceeds from the sale of 264 St. James Place would be delivered to the Trustee-Appellee, except those funds necessary to cover certain closing fees, and it authorized the Trustee-Appellee to pay the several tax liens as set out in the plan, the balance due on the Chase Manhattan mortgage (including arrears), $11,000 to Countrywide Home mortgage for post-petition payments for 266 St. James Place, and $14,000 for repairs at 266 St. James Place, all according to filed proofs of claim. See D. 28 ("Order Permitting Sale of Real Property Free and Clear of Liens and Interests").

On January 15, 2005, the sale of 264 St. James Place closed, and the sum of $490,181 was transferred to the Trustee-Appellee. See Decision at 12. The Trustee-Appellee proceeded to make all the above pre-confirmation distributions according to the required proofs of claim as filed, save for the expenses related to the plumbing emergency, regarding which no proof of claims were filed.

7

See Brief of Trustee-Appellee at 8. These disbursements totaled $319,864.28. See Decision at 12. The Trustee-Appellee also collected $24,924.48 in commissions, representing commissions on the entire balance of disbursements. The Trustee-Appellee later explained that the "compromise" offer to take commissions only on the arrearage of the Chase Mortgage had been removed after the Sales Hearing, and that, in fact, the Trustee-Appellee had disbursed both the arrearage and the balance of the funds owed to Chase, entitling him to commissions on the entire amount. See D. 57 ("Trustee's Supplemental Memorandum Regarding Debtor's Motion to Reconsider") at n.1; see also D. 50 ("Attorney Affirmation in Opposition to Debtor's Order to Show Cause") at ¶¶ 13-14.

On the same day, Valerus filed a new objection to confirmation, which sought $200,000 in damages for the rejection of the Valerus Contract. On February 1, 2004, Debtor-Appellant's counsel filed a motion objecting to the new Valerus claim. A hearing was held on March 16, 2004. On March 23, 2004, the day before the confirmation hearing, Debtor-Appellant settled the Valerus claim for $50,000.

On March 24, 2004, the day of the confirmation hearing, Debtor-Appellant electronically filed an application to withdraw her Chapter 13 filing, as well as a proposed order granting the motion to dismiss, and a copy of the Valerus settlement. Debtor-Appellant also notified Judge Milton's chambers of her decision to withdraw her bankruptcy. See Decision at 6. The confirmation hearing was nonetheless held at the scheduled time, although neither Debtor-Appellant nor Debtor-Appellant's counsel appeared. The Trustee-Appellee, who was present for the hearing, recommended confirmation of Debtor-Appellant's bankruptcy plan, which Judge Milton granted. Regarding Debtor-Appellant's absence, Judge Milton later emphasized that while he was aware of Debtor-Appellant's decision to withdraw, the hearing had not been marked off, and Debtor-Appellee

8

had not been excused, and thus Debtor-Appellee's failure to appear was in violation of Local Rule 3015-3 (noting that, "[u]nless excused, the debtor and debtor's attorney shall attend the hearing on confirmation of a Chapter 13 plan."). See Decision at 5. Regarding the feasibility of the plan, Judge Milton later noted that, at the time of the hearing, he did not have access to the stipulation settling the Valerus Contract claim for $50,000, and that Debtor's position had been that she owed Valerus $10,000. Id. at 8. On this score, the Trustee-Appellee later argued that confirmation had been warranted at the time, because there were sufficient funds to pay debtor's claims, the plumbing expenses, and the Valerus claim if it were fixed at the requested rate of $10,000. See D. 50 ("Attorney Affirmation in Opposition to Debtor's Order to Show Cause") at ¶ 22.

On March 31, 2004, Judge Milton signed an application by the Debtor-Appellant to show cause why he should not grant reconsideration of its decision confirming the plan. In her motion, Debtor-Appellant asked Judge Milton to grant dismissal retroactively (as of the date of confirmation), to fix and determine the Trustee-Appellee's fees for pre-confirmation disbursements, and to deny fees for post-confirmation disbursements. Debtor-Appellant argued that the fact that the Trustee-Appellee had retained fees on the pre-confirmation disbursements was a "complete surprise," because, according to Debtor-Appellant's counsel, during the Sale Hearing "the parties agreed that the question of trustee fees and commissions would be addressed at a later date." D. 46 at ¶¶ 40-41. Debtor-Appellant's counsel later stated that it was his recollection that the question of commissions had been expressly reserved. D. 51 at ¶ 21.

On April 7, 2004, Judge Milton signed an order confirming the plan, which Debtor-Appellant opposed. During a hearing on April 14, 2004, Debtor-Appellant requested a stay of future distributions by the Trustee-Appellee, which Judge Milton denied. When asked to explain why no

9

proof of claim had been filed regarding the alleged plumbing emergency, Debtor-Appellant stated only that the problem had been temporarily resolved as a result of the closing, because the new owner of 264 St. James Place had "agreed to assist the debtor in maintaining heat." R. 61 at 28. Judge Milton reserved decision and granted the parties leave to file additional papers. Both parties filed two sets of additional papers. According to the Trustee-Appellee, he "consulted with the United States Trustee's Office and received support for his position in the matter." Brief of Trustee-Appellee at 12. However, "[t]he U.S. Trustee elected not to file a brief at that time with the bankruptcy court . . . but stated they would appear at any further hearings before the bankruptcy court on the matter." Id.

On April 16, 2004, Debtor-Appellant appealed the order of confirmation, requesting an order staying the Trustee-Appellee from making any distributions pending the motion for reconsideration. See Order to Show Cause, 04-CV-01621 (ERK). After a conference (via telephone), I denied Debtor-Appellant's request for a preliminary injunction on April 22, 2004 "because of the pendency of the motion for reconsideration in the bankruptcy court." The Trustee-Appellee then proceeded to make the post-confirmation distributions of $83,070.89 for arrears on the 266 St. James Place mortgage, as well as $50,000 to Valerus, collecting an additional $10,795.08 in commissions. See id. at 21.

On September 30, 2004, Judge Milton issued his decision withdrawing the order of confirmation and granting Debtor-Appellant's motion to dismiss her case, but denying her request to grant dismissal retroactively. Judge Milton also refused to order the disgorgement of commissions, holding that the Trustee-Appellee was still entitled to commissions on both pre-confirmation distributions made pursuant to the Order of Sale and post-confirmation disbursements under the then-valid plan. See Decision.

Addressing the issue of confirmation first, Judge Milton emphasized that the initial decision to confirm the plan had been influenced by skepticism regarding Debtor-Appellant's motives, which had arisen as a result of Debtor-Appellant's failure to meet deadlines, her multiple filings, her failure to indicate that dismissal was contemplated prior to obtaining the rejection of the Valerus contract, her failure to submit proofs of claim regarding the alleged exigency involving the plumbing emergency, and finally, the timing of the motion to dismiss. See id. at 8-9. Confirmation was thus undertaken "in order to safeguard the distributions to creditors provided for under the plan, payments which the Court felt the Debtor could not be trusted to make outside the requirements of the Bankruptcy Code and the supervision of the Bankruptcy Court." Id. at 9.

Despite these concerns, however, Judge Milton concluded that the plain meaning of the Bankruptcy Code mandated dismissal. Specifically, Section 1307(b) of the Code, stating that "[o]n request of the debtor at any time, if the case had not been converted under section 1706, 1112, or 1208 of this title, the court shall dismiss a case under the Chapter," reflected that the only limitation on the right of a Chapter 13 debtor to dismiss a case was when a case had been previously converted. Id. at 9-10. The statute as a whole, in turn, indicated that the mandatory language in Section 1307(b) had been intentionally employed. Finally, Judge Milton noted that, according to the Second Circuit, "a debtor has an absolute right to dismiss a Chapter 13 petition under § 1307(b), subject only to the limitation explicitly stated in that provision." Id. at 11 (citing Barbieri v. RAJ Acquisition Corp., 199 F.3d 616, 619 (2d Cir. 1999)).

Turning to the issue of pre-confirmation commissions, Judge Milton found that Debtor-Appellant's "preparation and submission of the Order of Sale, based on the court's decision [that the Trustee-Appellee would receive and distribute the funds], without reserving the issue of fees

11

provided a clear indication that the Debtor agreed to fees and waived any right to object to them." Id. at 13-14. This determination was based on Judge Milton's finding that Debtor-Appellant's intention was to exploit the bankruptcy system by reaping its benefits without suffering its burdens, and that Debtor-Appellant's counsel's claims of surprise were not credible. Id.

Regarding post-confirmation commissions, Judge Milton noted that the disbursements had benefitted the Debtor-Appellant by paying her unsecured creditors in part; that the disbursements were properly made and the fees properly earned pursuant to a then-valid plan; and that I had denied a request by Debtor-Appellant to stay the Trustee-Appellee making any post-confirmation distributions. Id. at 15.

## DISCUSSION

### I. Legal Arguments on Appeal

Debtor-Appellant now appeals Judge Milton's decision in part, arguing that the court erred by not ordering the disgorgement of commissions earned on pre-confirmation disbursements, and on post-confirmation disbursements once the order of confirmation was withdrawn. Debtor-Appellant does not appeal the quantum of commissions, only the fact that commissions were collected and/or retained. With regard to pre-confirmation disbursements, Debtor-Appellant argues that because "[t]he only statutory provision for the payment of commissions is on the happening of confirmation," the retention of commissions on disbursements prior to confirmation was in error. The Trustee-Appellee responds that I lack jurisdiction to hear the Debtor-Appellant's appeal; that Debtor-Appellant is estopped from arguing against pre-confirmation commissions; that the commissions were proper; and, that the Bankruptcy Court acted within its general equitable powers. With regard to post-

12

confirmation disbursements, Debtor-Appellant claims that once the confirmation was withdrawn, "there [was] no basis for the Trustee-Appellee to retain [the commissions] as no confirmation order permitted said retention." The Trustee-Appellee responds that the confirmation order was valid at the time the disbursements were made.

## II.    Standard of Review

A district court reviews a bankruptcy court's findings of fact under the clearly erroneous standard; legal conclusions are reviewed de novo. In re Ionosphere Clubs, Inc., 922 F.2d 984, 988 (2d Cir. 1990); Rule 8013, Federal Rules of Bankruptcy Procedure. "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948). Adequate review in this case involves a mixed question of law and fact with legal conclusions to be reviewed de novo, and factual determinations to be reviewed for clear error. In re U.S. Lines, Inc., 197 F.3d 631, 640-641 (2d Cir. 1999).[1]

## III.    Compensation of a Chapter 13 Standing Trustee

For those with regular income, Chapter 13 of the Bankruptcy Code is an alternative to straight or liquidating bankruptcy. See 11 U.S.C. § 109. Chapter 13 allows an individual debtor to propose a plan providing for the repayment of part or all of the allowed claims against the debtor out of the debtor's future income over a period not to exceed five years from the date of the plan's confirmation.

---

[1]The Trustee-Appellee argues that abuse of discretion is the standard of review governing awards of compensation by a Bankruptcy Court. While this may be true as to discretionary awards, see In re Testaverde, 317 B.R. 51, 53 (E.D.N.Y. 2004), standing trustee fees, which are set by the Attorney General, see 28 U.S.C. 586(e), and are not discretionary matters of the Bankruptcy Court, see 11 U.S.C. § 326(b), do not evolve into discretionary awards merely because a bankruptcy judge refuses to disgorge them.

See Matter of Aberegg, 961 F.2d 1307, 1308 (7th Cir.1992). Payments to creditors pursuant to a Chapter 13 plan are ordinarily made from a debtor's income rather than from assets. See 8 Collier on Bankruptcy, ¶ 1300.01 (15th ed. rev. 2005). However, a plan may provide for the liquidation of property. See id; see also 11 U.S.C. 1322(b)(8). Typically, a debtor makes payments to a Chapter 13 trustee, who disburses them to creditors after confirmation of a plan. See 8 Collier on Bankruptcy, ¶ 1300.01 (15th ed. rev. 2005).

Compensation of a standing Chapter 13 trustee is governed by Section 586(e) of Title 28. A standing trustee appointed under Sec. 586(e) does not petition for compensation. Moreover, the Bankruptcy Court does not have the power to allow compensation of a standing trustee under Chapter 13. See 11 U.S.C. § 326(b) ("In a case under Chapter 13 . . ., the court may not allow compensation for services or reimbursement of expenses of . . . a standing trustee appointed under section 586(e) of title 28 . . . "). Rather, the Attorney General, after consultation with a United States Trustee that has appointed the standing trustee, sets the percentage fee at a level which does not exceed ten percent (in cases not involving family farmers) for an individual standing trustee. 28 U.S.C.A. § 586. The standing trustee, in turn, "shall collect such percentage fee from all payments received under plans in the cases . . . for which such individual serves as standing trustee." Id.

## IV.    Pre-Confirmation Payments

Debtor-Appellant argues that Sec. 586(e), governing the compensation of a standing trustee, must be read in conjunction with 11 U.S.C. § 1326, governing payments and distributions associated with Chapter 13 plans. The latter statute, in pertinent part, states:

> (2) A payment made under this subsection shall be retained by the trustee until confirmation or denial of confirmation of a plan. If a plan is confirmed, the trustee shall distribute any such payment in accordance with the plan as soon as practicable. If a plan is not confirmed, the

trustee shall return any such payment to the debtor after deducting any unpaid claim allowed under section 503(b) of this title.

(B) Before or at the time of each payment to creditors under the plan, there shall be paid--

(1) any unpaid claim of the kind specified in section 507(a)(1) of this title; and

(2) if a standing trustee appointed under section 586(b) of title 28 is serving in the case, the percentage fee fixed for such standing trustee under section 586(e)(1)(B) of title 28.

11 U.S.C. § 1326 (emphasis added). To Debtor-Appellant, the requirement that a Trustee-Appellee return payments when a plan is not confirmed prohibits the retention of commissions prior to confirmation, a conclusion supported by a parallel provision in Chapter 12 of the Bankruptcy Code providing for trustee commissions when a plan is not confirmed. See 11 U.S.C. §1226 ("If a plan is not confirmed, the Trustee-Appellee shall return any such payments to the Debtor-Appellant, after deducting . . . if a standing trustee is serving in the case, the percentage fee . . .).

Debtor-Appellant's argument, which mimics that of the Tenth Circuit Bankruptcy Appeals Court in In re Miranda, 285 B.R. 344 (10th Cir. 2001), is unhelpful because it is untethered to the facts at hand. In re Miranda, (an unpublished case which Judge Milton found had no precedential value), addressed a consolidated appeal of Chapter 13 cases in which the debtors had made payments to the standing trustee under the terms of their respective plans, and then, upon dismissal or conversion to Chapter 7 cases prior to confirmation, the standing trustee had sought to keep a percentage fee of those payments under 28 U.S.C. § 586(e). See id. However, as Judge Milton emphasized, this is not a case about a Chapter 13 trustee seeking a percentage fee on funds received and then returned to a debtor after withdrawal or conversion. Rather, this case involves commissions collected on debtor-requested, court-ordered, pre-confirmation distributions to creditors, facts which scuttle any neat statutory resolution here. For example, while Debtor-Appellant emphasizes that 11

15

U.S.C. §1326(2) requires a trustee to return payments to a debtor when a plan is not confirmed, she fails account for the fact that it first requires a trustee to retain payments until confirmation or denial of a plan. See 11 U.S.C. § 1326(2) ("A payment made under this subsection shall be retained by the trustee until confirmation or denial of confirmation of a plan"). This requirement is significant because it would appear to prohibit the pre-confirmation sale and distributions which Debtor-Appellant requested, and which took place here. By failing to acknowledge this requirement, Debtor-Appellant does not explain why the failure to retain payments, especially via disbursements pursuant to a court order, would not render moot the obligation to return the payments. Debtor-Appellant also fails to adequately account for subsection (B)(2), which requires the collection of standing trustee fees prior to or simultaneously with disbursements, and thus arguably mandated the commissions collected here. See 11 U.S.C. § 1326(B)(2) ("Before or at the time of each payment to creditors under the plan, there shall be paid . . . the percentage fee fixed for such standing Trustee-Appellee under section 586(e)(1)(B) of title 28); see also In re Leslie, 318 B.R.108 (Bankr. N.D. Texas 2004).

Debtor-Appellant's most promising argument is that disbursements were not made pursuant to a plan, but rather to an order of sale. However, Judge Milton determined that "the Order of Sale effectively amended the plan by providing the Trustee-Appellee as the disbursing agent," a determination which appears reasonable. First, there is nothing in the statute to suggest that for payments to be considered "under a plan" they must be under a confirmed plan. Second, judicial debate concerning what constitutes payments "under a plan," has not recognized a distinction between pre and post-confirmation payments. Instead, debate has focused on whether direct payments by debtors are "under plans," see In re Donald, 170 B.R. 579 (S.D. Miss. 1994), and on whether "under plans" invokes payments to creditors alone, or whether it should be read to mean that fees accrue on

all funds received, even though that would mean that a trustee would receive a fee on his or her own fee. See e.g., In re Edge, 122 B.R. 219 (D. Vt. 1990)(finding that the fee was intended only on payments to creditors); Pelofsky v. Wallace, 102 F.3d 350 (8th Cir. 1997) (same); see also 8 Collier on Bankruptcy, ¶ 1302.05[1][b-c] (15th ed. rev. 2005). Finally, there is at least some indirect support for the notion that pre-confirmation disbursements may be considered under a plan and result in trustee fees. See Leslie, 318 B.R. at 110-111 (allowing debtor to authorize pre-confirmation distributions to facilitate court policy of resolutions at or before confirmation while assuring adequate protection payments for secured creditors and the cost of administering the case including the trustee fee).

Debtor-Appellant also makes exhaustive reference to the fact that she initially proposed direct payments. It is true that a majority of courts have held that a trustee cannot assess his fees against payments made directly by the debtor because, in such a cases, the trustee has not "received" those payments. See In re Aberegg, 961 F.2d 1307 (7th Cir. 1992); 8 Collier on Bankruptcy, ¶ 1302.05[1][c] (15th ed. rev. 2005). However, Debtor-Appellant did not make any direct payments in this case, and the mere fact that she proposed them, prior to agreeing to allow the Trustee-Appellee to make the disbursements, does not cast doubt upon the consequences of the chosen course. In fact, as discussed below, that Debtor-Appellant sought direct payments as a means of avoiding commissions only underscores her awareness that disbursements by the Trustee-Appellee would result in commissions, thus casting doubt on her intentions as well as her claim of surprise.

Because the statutory scheme cited by Debtor-Appellant does not apply to the conduct at issue here, and thus cannot be said to prohibit the collection of commissions on pre-confirmation disbursements, the question becomes whether commissions were justified under the facts.

Debtor-Appellant argues that the question of commissions was expressly left open during the Sale Hearing, and that as a result, when commissions were collected by the Trustee-Appellee, it was a "complete surprise." D. 46 at ¶ 40. The Trustee-Appellee responds that the Debtor agreed to pay commissions by agreeing to disbursements by the Trustee-Appellee. The record contains support for Debtor-Appellant's position. For example, at the beginning of the hearing, immediately after the Trustee-Appellee asked for clarification on the issue of commissions, Judge Milton stated that the issue would be addressed if he granted the Motion to Sell, D. 66 at 2 ("I think that issue gets addressed if the court grants the application"). However, while Judge Milton granted the application, the issue was never raised. Moreover, Debtor-Appellant initially stated that she thought the issue of commissions was a "confirmation issue," and went on to note:

> It may very well be that at the end of the day the Debtor-Appellant will be able to confirm a plan, satisfy the Trustee-Appellee, pay the appropriate commissions but that looks like that fight is going to have to be resolved through the appropriate claims objection process which is something that cannot be addressed today.

Id. at 5. Later in the hearing, Debtor-Appellant referred to the argument outlined in her papers that allowing for commissions on all of Debtor-Appellant's liens was not feasible in light of the exigency:

> And there has never been a dispute as to whether or not the trustee should get paid commissions. I think the dispute is over the manner and the method that the trustee should get paid. My opposition papers go through an analysis of the available dollars from the sale. There wasn't $25,000 extra if [the] trustee were to get commissions on both houses. I'm certainly not asking for special treatment for this debtor. This is a Chapter 13 debtor and is responsible for the burdens as well as the benefits of Chapter 13. The biggest infusion of cash is going to come in from the sale of 264 [St. James Place.] Other than the minimal means for the debtor to make 266 [St. James Place] a rent producing economic entity, let the funds be turned over in full.

Id. at 6-7. Finally, after the court indicated that it was going to grant the application, and the discussion turned to the contents of the Order of Sale, Debtor-Appellant's counsel stated:

18

[T]he only discussion was the method upon which payment would be made at the closing. We have no objection to the trustee being at the closing and essentially having everything being paid to the trustee, in terms of methodology. And then secured creditors that laid out in our motion and laid out in our prosed order will get paid by the trustee. The only [] issue, of course, is that the $25,000 be paid to the debtor. It could be paid to the debtor directly or to the trustee. Again we have no objection one way or another. And I'll resubmit that, if you will . . . to make that clear.

Id. at 11 (emphasis added).

In light of the above, it is obvious that by emphasizing the feasibility of the "manner and method" of payment, Debtor-Appellant was, at least in her mind, agreeing to Trustee-Appellee disbursements, while continuing to object to the consequence of disbursements, i.e., commissions. See Reply Brief of Appellant at 6. However, the mere fact that Debtor-Appellant's claim finds support in the record does not mean that Debtor-Appellant should not be required to pay commissions. First, Debtor-Appellant's partial acquiescence in agreeing to Trustee-Appellee disbursements, but not commissions on those disbursements, was rendered unclear in light of numerous other statements by Debtor-Appellant's counsel, including assurances that the Trustee-Appellee would be paid commissions. Debtor-Appellant is not estopped by those statements, as the Trustee-Appellee urges, but she is at least partially responsible for her failure to articulate her position in clearer terms. Second, given the complexity of her argument, the differing positions of the parties, and Judge Milton's failure to raise the issue of commissions at the end of the hearing, it was the responsibility of Debtor-Appellant to make clear exactly what she was—and more importantly, was not—agreeing to when she agreed to allow the Trustee-Appellee to disburse the sale proceeds, and when she accepted the Bankruptcy Court's request that the Trustee-Appellee disburse the $25,000. This responsibility arose at the end of the hearing, and again upon preparation of the Order of Sale. Thus, while it is possible to look at the transcript and surmise that the issue was not resolved, it is also clear

that, if anyone, Debtor-Appellant was responsible for any attendant uncertainty with regard to commissions.

What ultimately tips the balance in this case, however, is not merely the question of <u>who</u> should be held responsible for that fact that the issue was left unresolved, but <u>why</u>. "The filing of a bankruptcy petition merely to prevent foreclosure, without the ability or the intention to reorganize, is an abuse of the Bankruptcy Code. Serial filings are a badge of bad faith, as are petitions filed to forestall creditors." <u>In re Casse</u>, 198 F.3d 327, 332 (2d Cir. 1999). Judge Milton determined that Debtor-Appellant's "preparation and submission of the Order of Sale, based on the court's decision, without reserving the issue of fees provided a clear indication that the Debtor agreed to fees and waived any right to object to them." This determination was informed, not by an express acceptance or waiver during the hearing (as explained above, there was none), but rather by Judge Milton's finding that "Debtor's intentions were to take advantage of the benefits of the Chapter 13 bankruptcy system without suffering any of the burdens of that system." This finding, in turn, arose from Debtor-Appellant's failure to meet deadlines, her multiple filings, her failure to indicate that dismissal was contemplated prior to obtaining the rejection of the Valerus contract, her failure to submit proofs of claim regarding the alleged exigency involving the plumbing emergency, and finally, the timing of the motion to dismiss.

Judge Milton's findings are supported by the record. First, Debtor-Appellant's filing history is inherently suspect. Second, Debtor-Appellant's entire argument before the Bankruptcy Court was centered on avoiding commissions, a fact which suggests her failure to raise the issue at the end of the hearing and in the Order of Sale was calculated. Third, the record indicates that Debtor-Appellant contemplated the course of a pre-confirmation sale followed by dismissal as a alternative means of

avoiding commissions prior to the Sale Hearing, which, in turn, suggests that at the time Debtor-Appellant prepared the Order of Sale, she did not actually intend to reorganize. For example, while arguing for direct payments in the Motion to Sell, Debtor-Appellant acknowledged that concern that direct payments could facilitate the circumvention of commissions was valid, but noted that commissions might be avoided anyway through a different method:

> Yet, a Chapter 13 debtor could always voluntarily dismiss his case, after a sale, and prior to confirmation, under 11 U.S.C. 1307(b), and then re-file a new case permitting only unsecured debts to be paid through the plan process subject to trustee commissions.

D. 25 at ¶ 28. This statement indicates that at the same time Debtor-Appellant's counsel was arguing for direct payments, while assuring the Bankruptcy Court that "[t]his is a Chapter 13 debtor [who] is responsible for the burdens as well as the benefits of Chapter 13,"and that he was not "seeking special treatment for this debtor," D. 66 at 7, Debtor-Appellant was preparing to exploit a sale-dismissal loophole if direct payments were refused. Debtor-Appellant's only argument, which is that the timing of dismissal was necessitated by the settlement of the Valerus claim for $50,000, is unpersuasive because it fails to address or negate the facts above.

Finally, Judge Milton's determination is supported by the troubling facts surrounding the alleged plumbing emergency in Debtor-Appellant's home at 266 St. James Place. Debtor-Appellant initially referenced the need for repairs in 266 St. James Place as a justification for direct payments, arguing that the cost of the repairs (coupled with several post-petition mortgage payments) left insufficient funds to pay commissions on the liens on both properties. See D. 25 at ¶¶ 36-42. During the Sale Hearing, Debtor-Appellant then claimed that the onset of winter had created an emergency which justified a pre-confirmation sale. Decision at 4. After the sale was approved, but direct

payments were not, the costs associated with alleviating the emergency were never realized. Id. at 9. This course of events suggests that the real purpose of the alleged boiler emergency was simply to create a means of avoiding commissions by manufacturing a cost that would justify and necessitate direct payments.

Debtor-Appellant's claim that she has never had the opportunity to explain how the "emergency" was resolved without cost is dubious. For example, after Debtor-Appellant was questioned about the plumbing issue during the April 14, 2003 hearing, at which time she stated that the issue had been temporarily resolved when the new owner 264 St. James Place had "agreed to assist [her] in maintaining heat," Judge Milton granted the parties leave to file additional papers. See Transcript of Hearing of April 14, 2004, at 28. Debtor-Appellant then submitted an affirmation with the Bankruptcy Court on May 21, 2004, see D. 58 ("Affirmation in Further Support of Order to Show Cause"), and then a sur-reply affirmation on June 1, 2004. See D. 60 ("Sur-Reply Affirmation."). Both papers represented opportunities to explain the mysteriously cost-free resolution of the alleged "emergency," yet neither contained an explanation. Notably, Debtor-Appellant even referenced the $14,000 for repairs in the first affirmation, see D. 58 at n.1 ("It is believed that the trustee did not retain the sum of $14,000 specified by this court in its December 12, 2003 order to be paid to debtor's plumbing contractor because debtor had not yet identified a particular contractor"), but, as noted, failed to acknowledge, let alone expand upon the explanation given in the hearing. Finally, the very brief here in which Debtor-Appellant complained of a lack of opportunity can likewise be said to have afforded her one. Without an adequate explanation, I agree with Judge Milton that the Debtor-Appellant's failure to provide for the plumbing expenses "call[ed] into question the need for the pre-confirmation Order of Sale in the first place" and "undermined the credibility of Debtor and Debtor's

22

counsel." Decision at 9.

Given the superior vantage of the Bankruptcy Court, it unnecessary for me to revisit Debtor-Appellant's arguments further and attempt to discern where the line might fall between mere inelegance and obfuscation. Rather, whatever support is to be found in the record must give way to Judge Milton's findings regarding Debtor-Appellant's motives and credibility, findings "which can hardly be characterized as clearly erroneous." See In re Casse, 198 F.3d at 333. "The Supreme Court's statements make clear that the purpose of the bankruptcy code is to protect the honest debtor, not to provide a shield for those who exploit the code's protection then seek to escape judicial authority when their fraudulent schemes are exposed." Graven v. Garner, 498 U.S. 279 (1991). I am comfortable with this result because it simply reinforces the cost that Debtor-Appellant should be required to pay in exchange for a benefit she has already received. To reiterate, as a result of the Chapter 13 process, Debtor-Appellant was able to avoid foreclosure on two properties, to reject the Valerus Contract and thus to reap an additional $180,000 after 264 St. James Place was subsequently sold, and to pay off virtually all of her outstanding debt. After requesting and receiving such benefits under the Chapter 13 process, Debtor-Appellant should not be heard to complain that, as a result of the very uncertainty that she was found to have cultivated, the corresponding burden is unjustified.

## V.  Post-Confirmation Payments.

Regarding commissions on post-confirmation payments, I affirm for substantially the same reasons as stated by the Bankruptcy Court. Additionally, I note that while the law of this Circuit is clear that debtor may dismiss a chapter 13 case at any time, see Barbieri, 199 F.3d at 619, I am unpersuaded that this fact should automatically warrant the disgorging of the commissions, especially where those commissions were properly earned on disbursements which benefitted the debtor, and

where it was found that the debtor intended to exploit the bankruptcy process.

## CONCLUSION

The decision of the Bankruptcy Court granting dismissal but refusing to disgorge commissions is affirmed.

**SO ORDERED:**

_____

Brooklyn, New York
August 8, 2005

Edward R. Korman
United States District Judge